# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00694-COA

### CONSOLIDATED WITH

## NO. 2015-CT-01903-COA

**CHARLES H. GRINER JR.**                                          **APPELLANT**

**v.**

**MELANIE GRINER**                                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/02/2018 |
| TRIAL JUDGE: | HON. JOHNNY LEE WILLIAMS |
| COURT FROM WHICH APPEALED: | MARION COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | S. CHRISTOPHER FARRIS |
| ATTORNEYS FOR APPELLEE: | RICHARD ANTHONY FILCE |
| | ERIK M. LOWREY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 10/08/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

## FACTS

¶1. Melanie and Charles "Chip" Griner Jr. were granted an irreconcilable-differences divorce in Marion County. During their marriage the couple had one daughter and one son. There was a mutual decision by Melanie and Chip that Melanie would stay home and devote her full time and energy to taking care of the children while Chip would work and provide for the family financially.

¶2.    During the divorce proceedings the couple provided written consent to the chancery court to decide alimony, equitable distribution of the marital estate, and equitable division of the parties' debts.

¶3.    In light of Chip's substantial separate estate—valued at over $7,000,000—the chancery court awarded Melanie $3,000 a month in periodic alimony, $480,000 in lump-sum alimony with the option to pay in monthly installments of $4,800 over ten years, and seventy percent of the marital estate. Chip was assigned one-hundred percent of the marital debts and ordered to maintain health insurance for Melanie.

¶4.    Upon Melanie's and Chip's separate motions, the chancery court amended its prior order to detail the marital estate as including:

(1) The marital home and its surrounding land valued at $762,500;

(2) Chip's twenty-five percent interest in the Florida condominium valued at $231,250;

(3) the AG Edwards IRA, Griner Drilling Services 401(k), AG Edwards Investment account;

(4) forty-four shares of the Citizens Bank Corporation valued at $2,860; and

(5) 6,505 shares of the First Federal Bank Corporation valued at $227,675.

¶5.    Chip subsequently filed a notice of appeal. On appeal this Court found a calculation error by the chancery court in its valuation of the real property.[1] *Griner v. Griner*, 235 So.

---

[1] The chancery court incorporated the gross, not net, value of the real property in its calculations. The chancery court calculated the value of the marital home and fifteen acres, plus the twenty-five acres at $762,500. However, the chancery court failed to take into account the $328,800 mortgage encumbering the home, leaving only $372,000 in equity. "This figure, combined with the $62,500 value of the adjacent twenty-five acres, results in a figure of $434,500 for purposes of marital division." *Griner*, 235 So. 3d at 186 (¶15).

3d 177, 186 (¶16) (Miss. Ct. App. 2017). Additionally, we held that while the chancery court was within its authority to order Chip to maintain a life-insurance policy with Melanie as the beneficiary, we found the amount—$1,000,000—to be unreasonable and excessive. *Id*. at 188 (¶29). We also found that the final judgment contained a scrivener's error making it unclear as to how long Chip was to maintain Melanie's health insurance. *Id*. at (¶27). In one part of the order Chip was to maintain the insurance for eighteen years, and another part of the order required Chip to maintain the insurance for eighteen months, so we remanded for clarification. *Id*.

¶6.     When we remanded this case back to the chancery court we assessed all costs of the appeal to Melanie. Chip filed a motion for recovery of the appellate costs, which was denied by the chancery court.

¶7.     On remand, the chancery court revised the equitable division and awarded Melanie seventy percent of the corrected value of the marital estate. To compensate for the decrease in the equitable division award, the chancery court increased Melanie's lump-sum alimony award to $700,000. The court also clarified that Chip was to provide health-insurance coverage for Melanie until she reaches sixty-five years of age. The chancery court further ordered Chip to maintain a life-insurance policy in the amount of $700,000, naming Melanie as the beneficiary.

## STANDARD OF REVIEW

¶8.     Great deference is given to a chancery court's decree of divorce. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994). This Court will not reverse such a decree

unless it is manifestly wrong as to law or fact. *Id*.

## DISCUSSION

### I.    Appellate costs must be paid from the first appeal.

¶9.    For his first assignment of error, Chip argues that the chancery court should have executed this Court's mandate assessing all appellate costs to Melanie. As a matter of law this is correct.

¶10.    In our 2017 opinion we ordered Melanie to pay all costs of the appeal, and the mandate echoed this language. *Griner*, 235 So. 3d at 190 (¶35) ("All costs of this appeal are assessed to the appellee."). A party who disagrees with an assessment of costs issued in an opinion may seek relief through a motion for rehearing under Mississippi Rule of Appellate Procedure 40. *See* M.R.A.P. 36(d) ("a party seeking relief may file a motion for rehearing under Rule 40"). If the mandate issues with a requirement to pay costs, our rules likewise allow a motion to retax costs, which must be filed within fourteen days of the issuance of the mandate. *Id*.

¶11.    While Chip filed a motion for rehearing, Melanie did not. After the Supreme Court denied a request for certiorari review, the mandate was issued. Melanie did not ask for the costs to be retaxed.

¶12.    The mandate is an order of this Court which must be followed without deviation. Relying upon a basic definition of the word, the Supreme Court has held it is "[a] command, order, or direction" which, once given, a "person is bound to obey." *Denton v. Maples*, 394 So. 2d 895, 897 (Miss. 1981). This "judicial command" directs a lower court "to enforce a

4

judgment, sentence, or decree." *Id*. Coupled with the opinion, the mandate is how we communicate with trial courts. "It is inherently necessary that this Court have some method of advising the lower court of the action taken here; under our practice the method used is the mandate." *Edmonds v. Delta Democrat Pub. Co.*, 221 Miss. 785, 787-88, 75 So. 2d 73, 74 (1954). Because it is to be followed without deviation, "[t]he trial court may not receive any other intelligence of the action of this Court." *Id*.

¶13. The procedure following the mandate must be followed strictly. "Upon issuance of our mandate, the trial court simply proceeds to enforce the final judgment." *Collins v. Acree*, 614 So. 2d 391, 392 (Miss. 1993). There is no discretion whether to follow a mandate, because "[t]he execution of the mandate of this Court is purely ministerial." *Id*. Indeed, the Supreme Court has ruled that any order which is contrary to the mandate is actually outside the jurisdiction of a trial court, and will be held "a nullity and void ab initio." *Denton*, 394 So. 2d at 897.[2]

¶14. After remand, Chip filed a motion for recovery of appeal costs. Our rules explicitly allow recovery of "[c]osts incurred in the preparation and transmission of the record, the costs of the reporter's transcript, if necessary for the determination of the appeal, the premiums paid for cost of supersedeas bonds or other bonds to preserve rights pending appeal, and the fee for filing the appeal . . . ." M.R.A.P. 36(c). Because the original appeal included a money judgment, there was a supersedeas bond, and the trial court required it to

---

[2] Note that while the mandate must be strictly followed, there remains the opportunity to later dive into what costs were actually incurred or should be paid per the mandate, since a party "who seeks relief as to any other matter involving costs shall seek relief in the trial court." M.R.A.P. 36(d).

5

be one million dollars. The bond carried a $20,000 premium. On remand, Chip requested these premium costs, the docket fee of $200, and a prepayment for record preparation, for a total of $41,200. The request did not seem to be fully formed, as Chip alleged some further bond premium might need to be paid pro rata, and the final record cost was not included. Nonetheless, the motion included exhibits reflecting the two bond premiums.

¶15. Melanie did not respond to the motion at all. The trial court did not make a lengthy ruling on the issue. Instead, its Findings of Fact and Conclusions of Law Following Remand noted in its last line that "All other requests for relief not granted are denied."

¶16. The chancery court did not have discretion to ignore the mandate. The mandate issued on February 15, 2018, and has to this point not been followed. In accord with our longstanding precedent, we reverse and remand for immediate compliance with the original mandate. Per the mandate for the original appeal, and in accord with the procedures set out in Rule 36, Chip is entitled to all costs for the original appeal.

> II. **The chancery court did not err in its valuation and equitable division of the marital estate**.

¶17. Chip goes on to raise a number of issues concerning the equitable distribution of the marital estate. First, Chip asserts that the chancery court again miscalculated the value of the marital property. Second, Chip argues that Melanie's receipt of seventy percent of the marital estate was improper due to the assignment of the marital debts. Finally, Chip alleges that the loans from Griner Drilling were personal in nature and not related to his business.

> A. **The chancery court properly calculated the value of the marital estate on remand.**

6

¶18.   Chip argues that the chancery court erred in its findings of fact due to a "discrepancy" in the values listed for the marital estate.  The chancery court's order provided a value of $812,584 and later another value of $304,150.  The $304,150 value clearly refers to the seventy percent of the martial home as this Court previously concluded.  Chip's argument is based on a miscalculation.  In his brief, Chip lists the marital home and connected fifteen acres as having a value of $700,000, with a $328,000 loan.  This math led him to conclude that the home equity was $260,400.  However, $328,000 subtracted from $700,000 is $372,000.   This amount combined with the value of the adjoining twenty-five acres ($62,500) totals to $434,500.  Seventy percent of $434,500 is $304,150.  This is the amount the chancery court factored into its calculation, and is correct.

¶19.   The second amount, $812,584, is Melanie's seventy-percent share of the marital estate.  The total value of the marital estate is $1,160,848.96.[3]  At most we are able to find a $10 discrepancy between the chancery court's calculation and our own.[4]

---

[3] We arrived at our total using the following values:

| | |
|---|---|
| Marital home and surrounding land: | $372,000 |
| Twenty-five acres: | $62,500 |
| Florida Condominium: | $231,250 |
| AG Edwards IRA: | $48,517.96 |
| 401(k) Griner Drilling: | $215,068 |
| AG Edwards Investment: | $978 |
| Citizens Bank stock: | $2,860 |
| First Federal Bank stock: | $227,675 |
| Total | $1,160,848.96 |

[4] Seventy percent of the total marital estate is $812,594.27.  The chancery court's calculation came to $812,584.

¶20.   We reversed the chancery court to fix the calculation errors regarding the value of the real property.  With this error corrected we affirm the chancery court's division of the assets.

**B.     The distribution of the marital estate has previously been decided.**

¶21.   Chip goes on to assert that awarding Melanie seventy percent of the marital estate was improper due to the assignment of the marital debts.  He argues that Melanie was awarded twice the amount of the marital estate with none of the debts.  "An equitable division of property does not necessarily mean an equal division of property." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).  Rather, the division must be equitable considering all of the *Ferguson* factors.  *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶22.   In *Griner*, 235 So. 3d at 187 (¶24), we "found no issue with the chancellor awarding Melanie seventy percent of the martial estate based on an erroneous, but higher, valuation figure for the marital estate."  We decline to reconsider this issue as it has previously been approved.  The chancery court's award of seventy percent of the marital estate to Melanie is affirmed.

**C.     The nature of the loans from Griner Drilling has previously been decided.**

¶23.   In his first appeal Chip argued that the loans from Griner Drilling were personal, not business.  This matter was affirmed in the first appeal and has become the law of the case. *Griner*, 235 So. 3d at 185 n.8.

¶24.   "Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a

similarity of facts." *Lewis v. Pagel*, 172 So. 3d 162, 174 (¶23) (Miss. 2015). Therefore, once an issue has become the law of the case, we will not revisit it.

¶25. Because the classification of the loan from Griner Drilling had become the law of the case, this argument is procedurally barred, and also without merit.

### III. The chancery court's alimony and support awards were proper.

¶26. Chip argues that the chancery court abused its discretion by awarding lump-sum and periodic alimony to Melanie because she did not suffer a deficit after the equitable distribution of the marital estate.

¶27. Mississippi precedent establishes that alimony awards are "a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it." *Flechas v. Flechas*, 724 So. 2d 948, 953 (¶14) (Miss. Ct. App. 1998). "As a result, the chancellor is given wide latitude in determining an alimony award." *Gutierrez v. Gutierrez*, 233 So. 3d 797, 811 (¶33) (Miss. 2017). Further,

> Lump-sum alimony can serve two distinct purposes. The first purpose is to aid the chancellor in equitably dividing the marital estate under the *Ferguson* factors. The second purpose is to aid the chancellor in correcting an equitable deficit, resulting from the equitable distribution of the marital estate under the *Armstrong* factors.

*Davenport v. Davenport*, 156 So. 3d 231, 240 (¶30) (Miss. 2014) (internal citations omitted). It has also been used to provide an equitable award to a spouse who made substantial contributions to the marriage, but whose contributions cannot be awarded through property division. *See Davis v. Davis*, 832 So. 2d 492, 499-502 (¶¶23-29) (Miss. 2002).

¶28. This Court previously found no error in the chancery court's detailed *Armstrong* and

9

*Ferguson* analyses. *Griner*, 235 So. 3d at 185 (¶14), 187 (¶24). We find Chip's arguments unpersuasive based on the chancery court's conclusion that Melanie exhibited a greater need and there was a great disparity between the two estates.

¶29. There is a disparity between the two estates in this case. The chancery court found a "great financial need and security" on the part of Melanie and a "financial ability" on the part of Chip. The chancery court's $700,000 lump-sum award did not disturb Chip's separate estate of over $7,000,000.

¶30. For these reasons, we find that the chancery court did not abuse its discretion on remand in ordering Chip to pay $3,000 per month in periodic alimony and $700,000 in lump-sum alimony, or $5,833.33 a month for ten years.

**IV. The allegation that Chip's expenses exceed his income is unsupported.**

¶31. Chip argues that the court-ordered alimony and support payments result in his monthly expenses exceeding his income. However, Chip dedicates less than a single paragraph to this claim in the facts section of his brief. Not only does he fail to continue this argument in the remainder of his brief, but he also neglects to provide any legal authority to support his contention. Failure to support allegations of error with argument or authority results in waiver. *Lambert v. State*, 518 So. 2d 621, 625 (Miss. 1987); *see also*, *Stubbs v. Stubbs*, No. 2017-CA-01734-COA, 2019 WL 350309, at *2 (¶7) (Miss. Ct. App. Jan. 29, 2019) (holding that "[i]f an appellant fails to support his allegation of error with argument or authority, this Court need not consider the issue").

¶32. Even so, Chip's argument still falls flat. In *Mosley v. Mosley*, 784 So. 2d 901, 909

10

(¶38) (Miss. 2001), a former husband claimed that the chancery court's alimony award was excessive and left him unable to live a "decent life." In that case we affirmed the chancery court's proper *Armstrong* analysis which found a substantial financial need on the part of the ex-wife while the ex-husband was stable in his employment and in a far better financial position. *Id*. at 910 (¶40).

¶33. As in *Mosley*, the chancery court here properly considered the *Armstrong* factors when it awarded alimony and support. Additionally, at the time of the original order Chip was to pay $1,500 a month in child support. Because he no longer has to pay child support as both children are now emancipated, there is no reason why the increase in lump-sum alimony (an amount $466.67 less than his child-support payment) should render Chip unable to make his monthly payments.

¶34. Chip's assertion that the chancery court's order requires him to make payments in excess of his monthly income is simply not supported by the record. Therefore, this issue is without merit.

> **V.** **The assignment of the marital debts has previously been decided and become the law of the case.**

¶35. Chip again argues that the chancery court failed to equitably divide the marital debts. However, this issue has previously been decided by this Court and has become the law of the case. *Griner*, 235 So. 3d at 186-87 (¶20).

¶36. In *Griner I* we reviewed the equitable distribution and found "no error in the chancellor's assigning responsibility for payment of the debts to Chip in light of Chip's substantial separate income and earning potential." *Id.* at 187 (¶20). We remanded with

11

specific instructions to reconsider the division of the marital estate based on a proper valuation of the real property. On remand, the chancery court re-evaluated the marital estate based on the real property's net value and adjusted the equitable distribution accordingly. The chancery court properly did not re-evaluate allocation of the marital debts. This is because the chancery court's previous holding that Chip was responsible for all of the marital debts was affirmed by this Court and had become the law of the case.

¶37. Because the assignment of marital debts had become the law of the case, this argument is procedurally barred, and also without merit.

### VI. The chancery court acted within its authority when it included health-insurance coverage in the alimony award.

¶38. As in the previous appeal, Chip continues to challenge the chancery court's authority to order that he maintain health-insurance coverage for Melanie. He argues that health insurance was not an issue the couple consented to having the chancery court decide. On appeal, this Court held that the chancery court did not exceed its authority when it awarded Melanie health insurance.

¶39. Health insurance falls under the category of alimony and support—which Melanie and Chip authorized the chancery court to determine. *See Voda v. Voda*, 731 So. 2d 1152, 1157 (¶27) (Miss. 1999) (holding that alimony is determined "based on the substance, not the label"). We reversed and remanded purely for clarification as to how long Chip has to maintain health insurance for Melanie—an issue not raised on appeal. The chancery court clarified that Chip was to maintain health insurance for Melanie until she reaches sixty-five years of age.

12

¶40. On appeal, Chip merely repeats his attack on the general grant of health insurance. He does not attack the duration. As discussed above, this issue has been previously decided and become the law of the case.

¶41. We affirm in part and reverse and remand in part. We reverse and remand to fully comply with the 2017 mandate and the procedures outlined in Rule 36(d). All other issues are affirmed.

¶42. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. CARLTON, P.J., AND TINDELL, J., NOT PARTICIPATING.**